IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

| | | |
|---|---|---|
| ANDREW GREER (REG. #27297-078), | § | |
| | § | |
| Movant, | § | |
| | § | |
| VS. | § | Cv No. 4:23-cv-_____ |
| | § | Cr No.  4:17-cr-00094-MAC-CAN-1 |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION UNDER 28 U.S.C. § 2255(f)(3) TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

COMES Petitioner, ANDREW GREER ("Greer"), appearing *pro se,* and in support of this motion would show as follows:

## I. STATEMENT OF JURISDICTION

Jurisdiction is vested in this Court under U.S.C. § 2255(f)(3). Under 28 U.S.C. § 2255, federal prisoners "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States" [may move the district] "court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Section 2255(f) sets forth the one- year statute of limitations for a motion under this section to, in relevant part, "run from the latest of --(1) the date on which the judgment of conviction becomes final; . . . [or]

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f). Section 2255(f)(3), however, provides that the one-year limitations period begins to run from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f)(3). See *United States v. Olvera*, 775 F.3d 726 (5th Cir. 2015); *Dodd v. United States*, 545 U.S. 353, 357-58 (2005) (holding that the one-year limitations period runs "from the date on which the right ... was initially recognized by th[e] [Supreme] Court").

## II. STATEMENT OF THE GROUND FOR REVIEW

Whether, in light of *New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. ___ (2022) and *USA v. Rahimi*, No. 21-11001 (5th Cir. 2023), Greer's § 922(j) charge on Count 1 must be vacated for resentencing because it is unconstitutional.

## III. STATEMENT OF THE CASE

### A.  Procedural Background

On June 14, 2017, a grand jury sitting in the United States District Court for the Eastern District of Texas, Sherman Division, returned a two (2) count Indictment

2

charging Greer. See Doc. 1.[1] Count 1 charged Greer with Possession of a Stolen Firearm, in violation of 18 U.S.C. § 922(j). *Id.* Count 2 charged Greer with Possession of an Unregistered Firearm in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d). *Id.* The Indictment also contained Notice of Intention to Seek Criminal Forfeiture, pursuant to 21 U.S.C. § 853 and 18 U.S.C. § 924(d). *Id.*

On October 4, 2017, a Change of Plea Hearing was held and Greer entered a guilty plea on Count 1 of the Indictment pursuant to a written Plea Agreement. See Docs. 17, 19.

On March 29, 2018, Greer was sentenced to 120 months' imprisonment, 3 years of Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $100. See Docs. 33, 35.

On October 19, 2020, Greer filed a Letter Motion for Compassionate Release. See Doc. 37.

---

[1] "Doc." refers to the Docket Report in the United States District Court for the Eastern District of Texas, Sherman Division in Criminal No. 4:17-cr-00094-MAC-CAN-1, which is immediately followed by the Docket Entry Number. "PSR" refers to the Presentence Report in this case, which is immediately followed by the paragraph ("¶") number. "CvDoc." refers to the Docket Report in the United States District Court for the Eastern District of Texas, Sherman Division in Civil No. 4:21-cv-00157-MAC, which is immediately followed by the Docket Entry Number.

On November 24, 2020, the Court issued a Memorandum and Order denying Greer's Letter Motion for Compassionate Release. See Doc. 43.

On January 11, 2021, Greer filed a Letter Motion for Reconsideration, which was denied on January 13, 2021. See Docs. 45-46.

On February 1, 2021, Greer filed a Second Letter Motion for Reconsideration, which the Court denied on June 28, 2021. See Docs. 47, 58.

On February 24, 2021, Greer filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"). See Cv.Doc. 1.

On July 12, 2021, Greer filed a Notice of Appeal re: denial of Second Letter Motion for Reconsideration. See Doc. 59.

On June 21, 2021, the District Court denied Greer's § 2255 Motion. See CvDocs. 11-12.

On July 6, 2021, Greer filed a Notice of Appeal re: denial of § 2255 Motion. See Doc. 13.

On September 24, 2021, the United States Court of Appeals for the Fifth Circuit dismissed Greer's appeal for want of prosecution because he failed to timely pay the docketing fee. See Doc. 61.

On November 22, 2021, the Fifth Circuit denied Greer's appeal as time barred.

See CvDoc. 15.

### B.   **Statement of the Facts**

1.   Offense Conduct

On March 22, 2017, a Denton County, Texas, sheriff's deputy conducted a traffic stop on a vehicle for making a wide mm. During the traffic stop, the deputy determined the vehicle occupants appeared nervous, and a drug-detecting dog alerted to the presence of drugs in rhe car. The deputy conducted a search of the v ehicle and located cash in the center console. 3 hydrocodone tablets in a purse, and 3 dosage units of LSD in a clear plastic bag. A search of the driver's person located a plastic bag with 3.4 methylenedioxymethamphetamine (MDMA). The driver and his passenger, who lived with Greer, were arrested, and investigation of their drug-related activities prompted detectives to suspect Greer and another one of his roommates were selling marijuana, MDMA, and LSD out of their home. Further investigation determined Greer was in possession of two shotguns and two handguns. A search warrant for Greer's home was obtained on the same day.

Later, on March 22, 2017, Little Elm. Texas, police officers and Denton County Sheriff's deputies traveled to Greer's home in Little Elm to execute the search warrant and were met by Greer's wife, Jennifer, who advised Greer that law enforcement officers were at their home and wanted to talk with him. Greer exited the home, and officers detained both him and his wife. A search of their residence commenced, and officers located the following items:

- A loaded Mossberg, Maverick 88, 12-gauge shotgun, serial no. MV21087V (found in the living room cabinet);
- A loaded Mossberg, Maverick. 12-gauge shotgun, serial no. MV42184L (found against a wall near a closet);
- A loaded Taurus, PT 945. .45 caliber handgun, serial no. NOC54023: 3,4 MDMA; 7 bags containing marijuana;

marijuana grinders; digital scales: ammunition; handgun magazines: small; plastic bags: and vacuum sealed bags; containing suspected marijuana residue (found in the living room safe);

- A loaded Taurus. PT111. 9 millimeter handgun, serial no. TJX53359: 2 Taurus handgun magazines; clear plastic baggies; and suspected marijuana residue: currency (found in the living room table);

- A loaded handgun magazine: cocaine; a plastic bag containing cocaine; a plastic bag containing a green, leafy substance: and two counterfeit $100 bills (found on the mirrored living room table);

- A loaded Glock. 43, 9 millimeter handgun, serial no. BABS864 (found on the Bedroom nightstand);

- Marijuana residue: a vacuum sealer: and a plastic baggie with a straw and two plastic bottle caps with a white, powdery substance (found in the closet);

- 9 one-pint bottles of promethazine with codeine (found at the refrigerator);

- 7 one-pint bottles of promethazine with codeine and wax paper containing tetrahydrocannabinol (THC) (found in the freezer); and

- Ammunition; a Ziplock bag box; and U. S. currency (found at the kitchen countertop).

Greer and his wife were arrested without incident, and a search of Greer's person located a large amount of cash in his pants pocket. All totaled, officers recovered about 383 grams of marijuana; 33 grams of cocaine; 200 grams of 3.4 MDMA; 46 grams of THC extract; 11,412 grams of promethazine with codeine: and $4.027 in currency. Laboratory reports were not provided to verify the weights of the drugs. Investigation of the Glock determined that the firearm had been reported stolen in September 2016, and investigation of the shotgun in the cabinet revealed the firearm had a pistol grip, an overall length of 25.5 inches, and a barrel length of 15.5 inches. All firearms were manufactured outside the state of Texas and had traveled in or affected interstate commerce.

See PSR ¶¶ 4-6.

2.    Plea Proceeding

On March 18, 2013, a Change of Plea Hearing was held before Magistrate Judge Christine A. Nowak. See Doc. 17. Greer entered a plea of guilty to Count 1 pursuant to a written Plea Agreement. See Doc. 19. In exchange of Greer's guilty plea, he would receive a 3-level reduction pursuant to USSG §§ 3E1.1(a) and (b). *Id.* The case was referred to the U.S. Probation Office for the preparation of the PSR.

3.    Presentence Report Calculations and Recommendations

The U.S. Probation Office prepared Greer's PSR on December 22, 2017. The 2016 Guidelines Manual, incorporating all guideline amendments, was used to determine Greer's offense level pursuant to USSG § 1B1.11. See PSR ¶ 10. Count 1: Possession of a Stolen Firearm calls for a Base Offense Level of 20 because Greer possessed a shotgun with an overall length of less than 26 inches and a barrel length of less than 18 inches, pursuant to USSG § 2K2.1(a)(4)(B). See PSR ¶ 11. Greer received a: 2-level increase since the offense involved three to seven firearms, pursuant to USSG § 2K2.1(b)(1)(A); another 2-level increase because Greer possessed a destructive device, specifically a short-barrelled 12-gauge shotgun, pursuant to USSG § 2K2.1(b)(3)(B); 2-level increase because Greer possessed a stolen firearm, pursuant to USSG § 2K2.1(b)(4)(A); and 4-level increase because Greer possessed any firearm or ammunition in connection with another felony offense, pursuant to USSG §

7

2K2.1(b)(6)(B). See PSR ¶¶ 12-15. The PSR calculated Greer's Adjusted offense level to be 30. See PSR ¶ 20. Greer received a three (3) level reduction for acceptance of responsibility, pursuant to USSG §§ 3E1.1(a) and (b). See PSR ¶¶ 22-23. The PSR calculated Greer's Total Offense Level to be level 27. See PSR ¶ 24. Greer's total criminal history points of 7, placed him in Criminal History Category IV. Based upon a Total Offense Level of 27 and a Criminal History Category of IV, the guideline imprisonment range was 100 months to 125 months. However, the statutorily authorized maximum sentence of 10 years is less than the maximum of the guideline range; therefore, the guideline range is 100 months to 120 months. USSG § 5G1.1(c)(1). See PSR ¶ 62.

### 4. Sentencing Proceeding

On March 29, 2018, a Sentencing Hearing was held before District Judge Marcia A. Crone. See Doc. 33. The Court sentenced Greer to 120 months' imprisonment, followed by 3 years' Supervised Release. See Doc. 35. The Court also ordered a payment of a Mandatory Special Assessment Fee of $100. *Id.* No direct appeal was filed in this case.

### 5. Postconviction Proceeding

On February 24, 2021, Greer filed a § 2255 Motion. See Cv.Doc. 1. He claims he is entitled to relief based on ineffective assistance of counsel. The Government was not

ordered to file a response. In response to the Court's Order as to the timeliness of his motion, Greer does not present evidence of how he was prevented from filing in a timely manner or that he is entitled to equitable tolling. Greer fails to show that "rare and extraordinary circumstances" prevented him from timely filing, *Davis*, 158 F.3d at 810-11, or that he exercised due diligence, *Palacios*, 723 F.3d at 604. For the said reasons, Greer's § 2255 motion was denied. See CvDoc. 15.

## V. <u>DISCUSSION</u>

As a preliminary matter, Greer respectfully requests that this Court be mindful that *pro se* pleadings are to be construed liberally. See *United States v. Kayode*, 777 F.3d 719 (5th Cir. 2014) (*Pro se* pleadings are to be held to less stringent standards than formal pleadings drafted by lawyers, and should therefore be liberally construed); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (same).

> ### <u>In Light of *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S.      (2022) and *USA v. Rahimi*, No. 21-11001 (5th Cir. 2023), Greer's § 922(j) Charge on Count 1 Must Be Vacated for Resentencing Because It is Unconstitutional.</u>

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ___ (2022), abbreviated *NYSRPA v. Bruen* and also known as *NYSRPA II* or *Bruen* to distinguish it from the 2020 case, is a landmark decision of the United States Supreme Court

related to the Second Amendment to the United States Constitution. The case concerned the constitutionality of the 1911 Sullivan Act, a New York State law requiring applicants for a license to carry a concealed pistol on their person to show "proper cause", or a special need distinguishable from that of the general public, in their application.

In a 6–3 decision, the majority ruled that New York's law was unconstitutional, and ruled that the ability to carry a pistol in public was a constitutional right under the Second Amendment. The majority ruled that states are allowed to enforce "shall-issue" permitting, where applicants for concealed carry permits must satisfy certain objective criteria, such as passing a background check, but that "may-issue" systems that use "arbitrary" evaluations of need made by local authorities are unconstitutional.

In wake of *Bruen*, several lawsuits involving federal and states' gun regulations have been filed, stressing on the judiciary need to evaluate the regulation not in consideration of the public good, but in light of the "historical tradition of firearm regulation", a phrase penned by majority opinion author Justice Clarence Thomas. Several of these cases had successfully overturned long-standing regulations due to the regulations being not of historic tradition.

The petitioners had asked the Supreme Court to review their case, specifically pressing the question of "whether the Second Amendment allows the government to

prohibit ordinary law-abiding citizens from carrying handguns outside the home for self-defense". The Supreme Court granted certiorari on April 26, 2021, though it limited the case to the question of "whether the State's denial of petitioners' applications for concealed-carry licenses for self-defense violated the Second Amendment". The case was heard on November 3, 2021. The petitioners were represented by Paul Clement, who served as solicitor general during the administration of George W. Bush and argued as amicus curiae on behalf of the United States in Heller, and on behalf of the National Rifle Association in support of the petitioners in McDonald. The respondents were represented by New York State Solicitor General Barbara Underwood, who served in the Solicitor General's Office during the administration of Bill Clinton and temporarily served as acting Solicitor General of the United States between the transition from Clinton to Bush.

The case was the first major gun-rights case that the Supreme Court had heard in more than a decade, outside of the moot *New York State Rifle & Pistol Association Inc. v. City of New York.* It was also the first gun-rights case to be heard by the six-member conservative majority, which included Justices Clarence Thomas, Neil Gorsuch and Brett Kavanaugh, who in prior opinions had emphasized the need for the Supreme Court to review the current stance on Second Amendment cases. Justice Amy Coney Barrett had also expressed support for a Second Amendment review prior to her

appointment to the Supreme Court. Because of the shift toward a more-conservative membership, some court analysts believed that the Court might interpret the Second Amendment more liberally in favor of individual rights over states' powers, which could render many existing public-possession regulations unconstitutional. However, as discussed by Vox's Ian Millhiser, the limited question that the Court granted may restrict the issue to concealed-carry licenses and not the matter of any and all public possession.

The case's decision was released on June 23, 2022. In a 6–3 opinion authored by Justice Clarence Thomas, the Court held that the state law was unconstitutional as it infringed on the right to keep and bear arms, reversing the Second Circuit's decision and remanding the case for further review.

Thomas' majority opinion, joined by Chief Justice John Roberts and Justices Samuel Alito, Neil Gorsuch, Brett Kavanaugh, and Amy Coney Barrett, effectively rendered public carry a constitutional right under the Second Amendment. Thomas wrote, "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need."

Because public carry is a constitutional right, Thomas ruled out use of the two-part test to evaluate state gun laws, which generally involved application of intermediate scrutiny, that many lower courts had used, and instead evaluated New York's law under a more-stringent test of whether the proper-cause requirement is consistent with the nation's historical tradition of firearm regulation. Thomas wrote that gun control laws that identify restricted "sensitive places," such as courthouses and polling places, would still likely pass constitutional muster, though urban areas would not qualify as such sensitive places.

After striking down the two-step test (formerly used by Courts of Appeals addressing Second Amendment issues), *Bruen* identified the new test courts must use on Second Amendment cases. The Court held: "When the Second Amendment's plain text covers an individual's conduct [here the right to bear arms], the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "'unqualified command.'"

The question here is, whether the New York's law require that applicants for unrestricted concealed-carry licenses demonstrate a special need for self-defense violate the Second Amendment?

13

In conclusion, New York's proper-cause requirement violates the Fourteenth Amendment by preventing law-abiding citizens with ordinary self-defense needs from exercising their Second Amendment right to keep and bear arms in public for self-defense.

The right to carry a firearm in public for self-defense is deeply rooted in history, and no other constitutional right requires a showing of "special need" to exercise it. While some "sensitive places" restrictions might be appropriate, Manhattan is not a "sensitive place." Gun restrictions are constitutional only if there is a tradition of such regulation in U.S. history.

Justice Samuel Alito authored a concurring opinion arguing that the effect of guns on American society is irrelevant to the issue.

Justice Brett Kavanaugh authored a concurring opinion, in which Chief Justice John Roberts joined, noting that many state restrictions requiring background checks, firearms training, a check of mental health records, and fingerprinting, are still permissible because they are objective, in contrast to the discretionary nature of New York's law.

Justice Amy Coney Barrett authored a concurring opinion noting two methodological points the Court did not resolve.

14

Justice Stephen Breyer authored a dissenting opinion, in which Justices Sonia Sotomayor and Elena Kagan joined. Justice Breyer argued that states should be able to pass restrictions in an effort to curb the number of deaths caused by gun violence, and the Court's decision "severely burdens the States' efforts to do so."

See *United States v. Rahimi*, (No. 21-11001) (5ᵗʰ Cir. 2023), the question presented in this case is not whether prohibiting the possession of firearms by someone subject to a domestic violence restraining order is a laudable policy goal. The question is whether 18 U.S.C. § 922(g)(8), a specific statute that does so, is constitutional under the Second Amendment of the United States Constitution. In the light of *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), it is not.

Zackey Rahimi levies a facial challenge to § 922(g)(8). The district court and a prior panel upheld the statute, applying this court's pre-*Bruen* precedent. See *United States v. Rahimi*, No. 21-11011, 2022 WL 2070392 at *1 n.1 (5ᵗʰ Cir. June 8, 2022). Rahimi filed a petition for rehearing en banc; while the petition was pending, the Supreme Court decided *Bruen*. The prior panel withdrew its opinion and requested supplemental briefing on the impact of that case on this one. Considering the issue afresh, we conclude that *Bruen* requires us to re-evaluate our Second Amendment jurisprudence and that under *Bruen*, § 922(g)(8) fails to pass constitutional muster.

Between December 2020 and January 2021, Rahimi was involved in five shootings in and around Arlington, Texas. On December 1, after selling narcotics to an individual, he fired multiple shots into that individual's residence. The following day, Rahimi was involved in a car accident. He exited his vehicle, shot at the other driver, and fled the scene. He returned to the scene in a different vehicle and shot at the other driver's car. On December 22, Rahimi shot at a constable's vehicle. On January 7, Rahimi fired multiple shots in the air after his friend's credit card was declined at a Whataburger restaurant.

Officers in the Arlington Police Department identified Rahimi as a suspect in the shootings and obtained a warrant to search his home. Officers executed the warrant and found a rifle and a pistol. Rahimi admitted that he possessed the firearms. He also admitted that he was subject to an agreed civil protective order entered February 5, 2020, by a Texas state court after Rahimi's alleged assault of his ex-girlfriend. The protective order restrained him from harassing, stalking, or threatening his ex-girlfriend and their child. The order also expressly prohibited Rahimi from possessing a firearm.[2]

A federal grand jury indicted Rahimi for possessing a firearm while under a domestic violence restraining order in violation of 18 U.S.C. § 922(g)(8), which provides:

---

[2] The validity of the underlying protective order, and Rahimi's breach of it, are not before us.

It shall be unlawful for any person[] who is subject to a court order that[:] (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . . to . . . possess in or affecting commerce, any firearm or ammunition . . . .

Rahimi moved to dismiss the indictment on the ground that § 922(g)(8) is unconstitutional, but he acknowledged that *United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020), foreclosed his argument.[3] The district court denied Rahimi's motion, and he pled guilty.

On appeal, Rahimi renewed his constitutional challenge to § 922(g)(8).[4] Rahimi again acknowledged that his argument was foreclosed, and a prior panel of this court agreed. See *Rahimi*, 2022 WL 2070392 at *1 n.1. But after *Bruen*, the prior panel withdrew its opinion, ordered supplemental briefing, and ordered the clerk to expedite

---

[3]

The Government urged Rahimi's argument was also foreclosed by *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001).

[4]

Rahimi also asserted that the district court erred when it ordered his federal sentence to run consecutively to sentences for his state crimes because the underlying conduct of the state sentences was relevant conduct for the purposes of U.S.S.G. § 1B1.3. The prior panel affirmed the district court. Because we find § 922(g)(8) unconstitutional and vacate Rahimi's sentence, we do not further address the sentencing issue here.

this case for oral argument before another panel of the court. *Rahimi* now contends that *Bruen* overrules our precedent and that under *Bruen*, § 922(g)(8) is unconstitutional. The Fifth Circuit agreed on both points.

In *Emerson*, Fifth Circuit held that the Second Amendment guarantees an individual right to keep and bear arms—the First Circuit expressly to do so. 270 F.3d at 260. But we also concluded that § 922(g)(8) was constitutional as applied to the defendant there. *Id.* at 263. "*Emerson* first considered the scope of the Second Amendment right 'as historically understood,' and then determined—presumably by applying some form of means-end scrutiny *sub silentio*— that § 922(g)(8) [wa]s 'narrowly tailored' to the goal of minimizing 'the threat of lawless violence.'" *McGinnis*, 956 F.3d at 755 (quoting *Emerson*, 270 F.3d at 264).

After *D.C. v. Heller*, 554 U.S. 570 (2008), courts coalesced around a similar "two-step inquiry for analyzing laws that might impact the Second Amendment." *McGinnis*, 956 F.3d at 753 (internal quotation marks omitted). First, we "ask[ed] whether the conduct at issue [fell] within the scope of the Second Amendment right." *Id.* at 754 (internal quotation marks omitted). If the conduct fell outside the scope of the Second Amendment right, then the challenged law was constitutional. *Id.* But if the conduct fell within the scope of the right, then we proceeded to the second step of the analysis, which applied either intermediate or strict scrutiny. *Id.* at 754, 757 (expressly

applying means-end scrutiny). In *McGinnis*, this court upheld § 922(g)(8) using this two-step framework. The initial panel in this case did likewise, citing *McGinnis*. *Rahimi*, 2022 WL 2070392 at *1 n.1. Enter *Bruen* expounding on *Heller*, the Supreme Court held that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30. In that context, the Government bears the burden of "justify[ing] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Put another way, "the [G]overnment must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. In the course of its explication, the Court expressly repudiated the circuit courts' means-end scrutiny—the second step embodied in *Emerson* and applied in *McGinnis*. *Id.* at 2128–30. To the extent that the Court did not overtly overrule *Emerson* and *McGinnis*—it did not cite those cases but discussed other circuits' similar precedent—*Bruen* clearly "fundamentally change[d]" our analysis of laws that implicate the Second Amendment, *Bonvillian Marine*, 19 F.4th at 792, rendering their prior precedent obsolete.

Our review of *Rahimi's* facial challenge to § 922(g)(8) is *de novo*. See *United States v. Bailey*, 115 F.3d 1222, 1225 (5th Cir. 1997). First, the court addresses the

Government's argument that Rahimi is not among those citizens entitled to the Second Amendment's protections. Concluding he is, we then turn to whether § 922(g)(8) passes muster under *Bruen*'s standard.[5]

According to the Government, *Heller* and *Bruen* add a gloss on the Second Amendment that restricts its applicability to only "law-abiding, responsible citizens," Heller, 554 U.S. at 635, and "ordinary, law-abiding citizens," *Bruen*, 142 S. Ct. at 2122. Because Rahimi is neither responsible nor law-abiding, as evidenced by his conduct and by the domestic violence restraining order issued against him, he falls outside the ambit of the Second Amendment. Therefore, argues the Government, § 922(g)(8) is constitutional as applied to *Rahimi.*

There is some debate on this issue. *Compare Kanter v. Barr*, 919 F.3d 437, 451–53 (7th Cir. 2019) (Barrett, J. dissenting), abrogated by *Bruen*, 142 S. Ct. 2111, with *Binderup v. Att'y Gen. U.S.*, 836 F.3d 336, 357 (3d Cir. 2016) (*en banc*) (Hardiman, J., concurring in part and concurring in the judgments). As summarized by

---

[5]   The Government also argues that because Bruen endorsed "shall-issue" licensing schemes, and Texas's shall-issue licensing scheme (since modified to allow "constitutional carry," see 2021 Tex. Sess. Law Serv. Ch. 809 (West)) included the requirement that an applicant not be under a domestic violence restraining order, it follows that § 922(g)(8) is constitutional. Of course, the *Bruen* Court did not rule on the constitutionality of 43 specific state licensing regimes because that was not the issue before the Court. See *Bruen*, 142 S. Ct. at 2138 n.9. Rather, the Court merely blessed the general concept of shall-issue regimes. Id.

now-Justice Barrett, "one [approach] uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). The Government's argument that Rahimi falls outside the community covered by the Second Amendment rests on the first approach. But it runs headlong into *Heller* and *Bruen*, which we read to espouse the second one.

Unpacking the issue, the Government's argument fails because (1) it is inconsistent with *Heller, Bruen*, and the text of the Second Amendment, (2) it inexplicably treats Second Amendment rights differently than other individually held rights, and (3) it has no limiting principles. We briefly examine each deficiency.

The Second Amendment provides, simply enough:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II. *Heller* explained that the words "the people" in the Second Amendment have been interpreted throughout the Constitution to "unambiguously refer[] to all members of the political community, not an unspecified subset." 554 U.S. at 580. Further, "the people" "refer[] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* (citing *United States v.*

21

*Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)). For those reasons, the *Heller* Court began its analysis with the "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans," *id.* at 581, and then confirmed that presumption, id. at 595. *Heller*'s exposition of "the people" strongly indicates that Rahimi is included in "the people" and thus within the Second Amendment's scope.

To be sure, as the Government argues, *Heller* and *Bruen* also refer to "law-abiding, responsible citizens" in discussing the amendment's reach (*Bruen* adds "ordinary, law-abiding citizens"). But read in context, the Court's phrasing does not add an implied gloss that constricts the Second Amendment's reach. Heller simply uses the phrase "law-abiding, responsible citizens" as shorthand in explaining that its holding (that the amendment codifies an individual right to keep and bear arms) should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." *Id.* at 626–27; see also id. at 627 n.26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."). In other words, *Heller*'s reference to "law-abiding, responsible" citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights. *Bruen*'s reference to "ordinary, law-abiding" citizens is no different. See 142 S.

22

Ct. at 2134.

The Government's reading of *Heller* and *Bruen* also turns the typical way of conceptualizing constitutional rights on its head. "[A] person could be in one day and out the next: the moment he was convicted of a violent crime or suffered the onset of mental illness, his rights would be stripped as a self-executing consequence of his new status." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). This is "an unusual way of thinking about rights [because i]n other contexts that involve the loss of a right, the deprivation occurs because of state action, and state action determines the scope of the loss (subject, of course, to any applicable constitutional constraints)." *Id.* "Felon voting rights are a good example: a state can disenfranchise felons, but if it refrains from doing so, their voting rights remain constitutionally protected." *Id.* at 453. The Government fails to justify this disparate treatment of the Second Amendment.

Perhaps most importantly, the Government's proffered interpretation lacks any true limiting principle. Under the Government's reading, Congress could remove "unordinary" or "irresponsible" or "nonlaw abiding" people—however expediently defined—from the scope of the Second Amendment. Could speeders be stripped of their right to keep and bear arms? Political nonconformists? People who do not recycle or drive an electric vehicle? One easily gets the point: Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections; to the

23

contrary, the Supreme Court has made clear that "the Second Amendment right is exercised individually and belongs to all Americans," *Heller*, 554 U.S. at 581. Rahimi, while hardly a model citizen, is nonetheless part of the political community entitled to the Second Amendment's guarantees, all other things equal.

Rahimi's possession of a pistol and a rifle easily falls within the purview of the Second Amendment. The amendment grants him the right "to keep" firearms, and "possession" is included within the meaning of "keep." See *id.* at 2134–35. And it is undisputed that the types of firearms that Rahimi possessed are "in common use," such that they fall within the scope of the amendment. See *id.* at 2143 ("[T]he Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'") (quoting *Heller*, 554 U.S. at 627)). Thus, *Bruen*'s first step is met, and the Second Amendment presumptively protects Rahimi's right to keep the weapons officers discovered in his home. See *id.* at 2126.

Aspects of how the *surety* laws worked resemble certain of the mechanics of § 922(g)(8) as well. The *surety* laws required only a civil proceeding, not a criminal conviction. The "credible threat" finding required to trigger § 922(g)(8)'s prohibition on possession of weapons echoes the showing that was required to justify posting of surety to avoid forfeiture. But that is where the analogy breaks down: As the

Government acknowledges, historical *surety* laws did not prohibit public carry, much less possession of weapons, so long as the offender posted surety. See also *id.* at 2149 (noting that there is "little evidence that authorities ever enforced surety laws"). Where the *surety* laws imposed a conditional, partial restriction on the Second Amendment right, § 922(g)(8) works an absolute deprivation of the right, not only publicly to carry, but to possess any firearm, upon entry of a sufficient protective order. At bottom, the historical *surety* laws did not impose "a comparable burden on the right of armed self defense," *id.* at 2133, as § 922(g)(8).10

The Government fails to demonstrate that § 922(g)(8)'s restriction of the Second Amendment right fits within our Nation's historical tradition of firearm regulation. The Government's proffered analogues falter under one or both of the metrics the Supreme Court articulated in *Bruen* as the baseline for measuring "relevantly similar" analogues: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* As a result, § 922(g)(8) falls outside the class of firearm regulations countenanced by the Second Amendment.

In conclusion, doubtless, 18 U.S.C. § 922(g)(8) embodies salutary policy goals meant to protect vulnerable people in our society. Weighing those policy goals' merits through the sort of means-end scrutiny our prior precedent indulged, we previously concluded that the societal benefits of § 922(g)(8) outweighed its burden on Rahimi's

Second Amendment rights. But *Bruen* forecloses any such analysis in favor of a historical analogical inquiry into the scope of the allowable burden on the Second Amendment right. Through that lens, we conclude that § 922(g)(8)'s ban on possession of firearms is an "outlier[] that our ancestors would never have accepted." *Id*. Therefore, the statute is unconstitutional, and Rahimi's conviction under that statute was vacated and reverses the district court's ruling to the contrary.

Thus, in light of *Bruen* and *Rahimi*, Greer prosecution under 18 U.S.C. § 922(g) is null and void. Hence, the Court should consider and vacate Greer's sentence.

## VI. <u>CONCLUSION</u>

For the above and foregoing reasons, Greer's sentence should be vacated for resentencing because § 922(j) is unconstitutional, in light of *Bruen* and *Rahimi*.

Respectfully submitted,

Dated: May 22, 2023

ANDREW GREER
REG. NO. 27297-078
USP COLEMAN I
U.S. PENITENTIARY
P.O. BOX 1033
COLEMAN, FL 33521
Appearing *Pro Se*

26